United States v. Rettigliano is being heard together with the appeal of a habeas petition, Lesnowski v. United States of America, but we'll hear first from the parties in United States v. Rettigliano and Lesnowski. May it please the Court, my name is Joseph Ryan. I've represented Mr. Rettigliano throughout the entire proceedings below and before the Court on the prior appeal. And my objective in this argument is to try to convince Your Honors that in the interest of justice, Mr. Rettigliano should be given a new trial based upon newly discovered evidence generated by the victim, alleged victim agency in this case. And in our opinion, the government perpetrated a giant hoax on the jury, the District Court, and this Court. In the prior opinion, this Court said fraud was epidemic because 79% of Long Island Railroad applicants were approved and only 21% of Metro-North were. That finding was based upon a false presentation by the government at the trial. Because the RRB, Inspector General, is telling us and telling Congress that the RRB, under this lenient standard, grants 98% of the disability applications. It doesn't matter whether it's Metro-North, Long Island Railroad, New Jersey Transit, or South Pacific. And that's because the standard to determine whether you're eligible for a pension doesn't require you to be in a wheelchair, as argued by the government, in this Court and to the jury. It only requires that... Lots of evidence that the government relies on in this case is in the non-medical portion of the application, where the applicant says, it was difficult for me to do this, it was hard to do that. The non-medical portion of the applications did not determine the pension grant. It's not so with respect to all of the materials provided by Dr. Lesnowski, is it? Dr. Lesnowski is the medical assessment of the application. Exactly. Correct. And that's what they decided the pension on. It was fraudulent. It was not fraudulent. They didn't prove it was fraudulent. On reinstatement with other doctors' assessments, there was reinstatement, but the evidence of fraud with respect to Dr. Lesnowski was that he basically was filling out fabricated paper trails to support disability applications. He knew that people were working and could continue to work. That was his knowledge, whatever other doctors subsequently found. He made an admission that he exaggerated at least 20% of the applications. In other words, looking at all of this evidence, the medical as well as the non-medical part of the application was falsified. That's what the jury found. That is incorrect assessment of this record. Go ahead, tell me. Their effort to prove that Dr. Lesnowski was fabricating was an expert that they called, Dr. Barron. Dr. Barron just interpreted notes of Dr. Lesnowski. He gave an interpretation that said it was inconsistent with playing golf. Dr. Barron had no familiarity with the occupational disability standard, and he never was asked to examine Mr. Italiano. At the trial, he was asked, over the weekend, would it help you? He said, that would be a different story. You had an expert who didn't have, in my opinion, sufficient knowledge to be able to make an opinion. In fact, in cross-examination and brief, you'll see that Dr. Barron, their expert, says, I can't say whether or not this is a false or accurate. But there are also testimony from at least four of Dr. Lesnowski's patients about how they asked him to create a paper trail for false disability claims. It wasn't just an expert. No, they didn't say for false disability claims. The problem with the four people who tested. Yeah, they asked for the creation of a paper trail. There was no one that, first of all, there's only two witnesses in Mr. Italiano's case. And that was James Ma and Christopher Palante. And neither one, and you're talking about Dr., you're talking about Ellison and these other witnesses, all right? They were the ones who testified against Marie Barron, because she prepared their applications. With respect to Mr. Italiano, they called two witnesses, Ma and Palante. And neither one said they hired Mr. Italiano to falsify their applications. Not at all. And both of them told him that we had bad backs. In fact, Palante was sideswiped by a 2,000-horsepower locomotive on his last day of work. And Dr. Lesnowski, in his notes, showed how he treated it with steroids and things of that nature. It is wrong to assume in this record that the government proved that Dr. Lesnowski was fabricating Mr. Italiano's injuries because- Did you introduce any evidence at trial to show that Mr. Italiano or other Long Island Railroad employees who successfully applied for disability were in fact disabled under the prevailing standards at the time? I mean, part of what the argument is now is- Yes. The answer is yes. So you did. Yes. On the cross-examination of RRB witness, the only one, Mr. Robert Coleman, who was a government witness on cross-examination, but grudgingly finally admitted that if Mr. Italiano had a torn meniscus in his knee, a shoulder problem, and degenerated disc, he may be eligible under the- That's a hypothetical. I'm asking whether you introduced affirmative evidence demonstrating that Mr. Italiano was in fact disabled under the applicable standards at the time of the- Well, we relied on the government's evidence. We relied on Exhibit 100. But part of what's happening now is that, you know, 10 years later, determinations made well after the fact, you're looking to and pointing to those as establishing that at the time, people were in fact disabled under the prevailing standard, notwithstanding false statements and the evidence that Judge Pacin has pointed to, Mr. Parlante, Gagliano, Super, Ellenson, Marr, and Palenti, that there were false statements made. First of all, the false statements made are part of the subjective part of the application. And the Railroad Retirement Board does not rely on those to make a determination. Your Honor pointed out in the LIFAC decision that this materiality and relevancy are not synonymous. The LIFAC decision is 808, Fed 3rd, 160. I'm familiar with that. Okay. All right. And in this case- I know you want to reserve time for rebuttal. You can take it now if you want. No. I'll hear from the government first. Thank you. We'll hear from your co-counsel then. May it please the Court. My name is Tom Durkin, and I'm from Chicago, and I've never been here before. It's kind of a big thrill. We are from the second city, and we always think of ourselves as second rate, I hate to admit. I worked on the Seventh Circuit. It's my second favorite circuit. Well, it's my favorite, but we always look to you guys for wisdom, and we kind of think- Go ahead. Let's hear your argument. Part of my argument, and I'm going to go off of what I wanted to say. The first thing I want to say is John Klein, who wrote our briefs, couldn't be here today because he has a death penalty case in Georgia. I don't normally-I'm a trial lawyer. I'm not an appellate lawyer anymore. But I would refer you both to our reply briefs more than anything else. I think they're excellent, and I think they address a lot of the questions you've asked. The first thing I want to say, based on what I heard you ask Mr. Ryan, is that if you're going to rely on a jury finding in this case, then you have to give us a new trial, because this case was so affected by the statistical evidence. You cannot ignore the impact the statistical evidence had from the two different railroads, and there's a mountain of reasons why it was wrong to begin with, but we were slapped by that throughout the whole trial. You can't get around that. There were no specific findings of false statements, and with respect to the four patients of Dr. Lesniewski, the government can come in and tell you exactly what was false. One of the things the government says in their brief, which I take strong issue with, is that it was despite having offered little or no meaningful treatment to these patients. That's just not correct. And if you look at our reply brief from page 5 to 8, the testimony of those four witnesses is laid out. Every one of them was prescribed medications. Every one of them, one had a documentable torn rotator cuff. And each one of them, Dr. Lesniewski recommended surgery for all four of those patients. So to say that it was all false is just nonsensical to me, and I don't know. Again, that's where we got whipsawed at the trial by the statistical evidence. Well, if you're talking about, you know, not the restitution of damage or anything like that, that's a subject of a separate appeal. You might admit to federal agents that he exaggerated at least 20 percent of the application. But he did not admit that he knowingly and intentionally joined a conspiracy to defraud the Long Island Railroad. He said specifically he thought there would be more pushback. He had no idea that. So he was exaggerating applications, thinking that people would catch the exaggerations? I mean, and on the conspiracy, several of his patients testified that they expressly went to his office for that purpose. That would be enough to support a conspiracy conclusion. It can be a tacit conspiracy. With all due respect, Judge, I don't think so, because each one of them said that they got treated by Lesniewski like they did by every other doctor. I cross-examined those people. Not one of them said that they had somehow winked and nodded with Lesniewski or they had discussed somehow trying to get around this. Not one. There was a note from one of the patients saying that he was concerned that what was documented already was not enough. That's right. But that's why he . . . Come up with more. Why isn't that . . . Well, because, more importantly . . . A request from the patient to the doctor to make the application. I don't think there's anything wrong on its face for going to a doctor with respect to documenting disability when you're entitled. But you're asking us to look at this in the light most favorable to your client. We're not trying this case. The standard here is whether the district judge abused its discretion in concluding that it had no real concern that an innocent person might have been convicted or that a manifest injustice was done. That's the standard for getting a new trial under Rule 33. I don't see how the fact that you can now, in light of the fact that they granted a lot of these people's disability benefits, maybe have a better argument on this statistical evidence. That's not the standard for getting a new trial. How do you satisfy the standard, let alone show us that the district judge abused its discretion? Because I believe you can read this record with the amount of the reliance that the government took with the statistical evidence that this is a game changer. And I think it is . . . It's not a game changer. It's whether we think an innocent person was convicted. And, you know, as I said, your client admits that he was exaggerating records. But, Judge, with all due respect, that is not a confession. It is certainly not a confession to this conspiracy. It was taken also out of context. We weren't permitted to put the whole statement in. There were two different statements that he made. They were taken out of context. He offered to continue to help them. This . . . All right. Thank you, Judge. I know you two want to reserve time for rebuttal. I do. Thank you. Let's hear from the government. May it please the Court. Daniel Trani for the government. I represent the government at trial in these proceedings before the district court and on appeal. As the district court found, these post-Board Order approvals, which occurred in some cases more than a decade after the fraudulent events at issue in this case, provide no basis for new trials or, in connection with the 2055s, which will be discussed later, resentencings. The Board Order process, by its terms, had no bearing on the truthfulness of the documentation submitted by the defendants and their co-conspirators to the ORB or the entitlement of any of the former Long Island Railroad employees to disabilities at the time of their earlier fraudulent . . . Nonetheless, I mean, the standard, even recognizing the standard on Rule 33, is difficult to meet. And you have abuse of discretion, need to show manifest injustice, and so on. I'm still troubled by the fact that these were retroactive determinations back to the date of the first disability determination. That it was . . . So, with suggesting that there . . . Well, they may not have reassessed the records submitted at the time, that there was enough confidence to make those payments all over again at a very high rate. You know, depending how we . . . Even acknowledging that some people didn't reapply, it looked like, from the numbers I could discern, a fairly high percentage did reapply. And that . . . And your adversary is saying that this was a key element of the government's case to the jury, suggesting that this was an adequate basis for inferring the intent that was needed to convict under both the conspiracy and the substantive charges. So, I am concerned that the trial did . . . And I don't know the record in detail of the whole trial, but that the government's case did turn heavily on the statistics at the time, and that some of the statements by the cooperating witnesses were at most equivocal. How do you respond to that argument? Certainly, Your Honor, a few responses. The first is just the initial premise. The RRB did not determine retroactively that anyone was entitled to a disability at the time of their initial applications. The way the process worked is that the RRB made a determination that we are not going to consider that. Didn't it make the payments retroactive? They made them retroactive to the date of their termination. So, they were terminated as of the date of the board orders, which was after trial. And they made their determinations retroactive to that date. It didn't go back further. It was limited retroactivity. Correct. They terminated the applicant's disabilities and said you can reapply, and we will make a determination as of the date of the termination. But we are saying nothing about your entitlement to a disability at any time prior to that, although they didn't go back and seek to recover it, but they made no determination pursuant to the process about anything prior to the termination date. So, that's just as far as what their findings showed, which I think is also important in understanding the arguments with respect to the statistical evidence. The entire argument about the statistical evidence depends upon an assumption that these post-board order approvals say anything about entitlement to disability of 80% of 50-year-old Long Island Railroad employees at the time of their initial fraudulent disabilities, which it says nothing about. So, even given the existence of the RRB's findings 10 years later, the evidence does not affect the statistical evidence and the comparative evidence. That comparative evidence, with or without the post-board order approvals and the recertifications, is compelling evidence of the fraud. There's just no way to look at a railroad that has 80% of its employees applying for and obtaining disabilities when a comparative railroad in the same geographic region with the same facilities and the same equipment has a disability rate that is at 20%. But didn't that discrepancy continue after the redeterminations at such a high rate? Yes, Your Honor, and yes. But the point is there is no explanation for it other than fraud. No one has put forward a reason for why two railroads The RRB just re-endorsed those figures in effect, saying basically that the standard is very lax. I respectfully disagree on what the RRB found. So, a couple responses to that. We have been assuming that there is no fraud or this entire process is entirely above board. So, there's no finding that is correct. There's no indication that that is correct. But the RRB is not making a finding that their standard is low or their standard is lax. The standard is what the standard is. Are you suggesting that the fraud is continuing? Your Honor, it's a possibility. But ultimately, the standard is a standard. And it is the same standard that applies to Long Island Railroad employees that applies to Metro-North employees. And the fundamental standard is that you are unable to do your job. You are physically unable to do your job. 80% of Long Island Railroad employees at the age of 50 have claimed and are found to be unable to do their job. That is not the case at Metro-North. The only difference between Metro-North and Long Island Railroad is that there is a financial incentive at Long Island Railroad to retire early and apply for disabilities. The problem for you now is that that argument is somewhat undercut by the fact that a very large number of Long Island Railroad employees have been found on untainted medical reports to satisfy the standard. Now, I recognize that the Inspector General's report has criticized what he called a ludicrous reinstatement rate. But nevertheless, that is untainted by the fraud. Your Honor, on that point, the same arguments would be made with or without the Post Board Order approvals. The same evidence would be admitted. The response would be, but untainted doctors' reports show that they satisfy the standard. And the question at the criminal trial is not whether the standard is sound or not. Well, Your Honor, to the extent it's untainted, it's untainted from a decade later. So whatever arguments they want to make about a recertification procedure that occurred a decade after the events at issue in the case, when not only is it just temporarily 10 years later, the applicants are a decade older, their physical conditions are attributable or physical conditions of someone who is in their 60s as opposed to someone in their 50s. The claimed physical conditions are different. So there is no relevance to that evidence, and there's nothing that would undercut any of the evidence that the government offered at trial or the arguments that the government made from that evidence at trial. But fundamentally, the point is the one that you raised earlier, Judge Rodger, which is that this is not what's at issue in a Rule 33, with respect to a Rule 33 motion. The issue is not whether there's some evidence that would or would not have been admissible. It's not whether there are some arguments that would or would not have been permissible or more or less persuasive. The issue is whether there is a serious concern that an innocent person has been convicted. Judge Marrero found fairly easily that that was not the case. He was the trial judge who presided over the three-week trial in this case, who is therefore entitled to broad discretion and certainly did not abuse that broad discretion in concluding that there was overwhelming evidence of the defendant's guilt and that there was nothing about the post-court order process or the recertifications that would have any bearing on that. If there's no further questions, we'll rest in our briefs. Thank you. Judge Ryan. Untainted, untainted, was developed by doctors employed by the RRB well before the 10-year or 8-year review. During the period of pensions, the RRB would monitor and examine with their own doctors by IMEs, independent medical examinations. James Marr, one of the two witnesses testifying, Mr. Retigliano, was found by the RRB doctor. He couldn't lift more than 30 pounds when the job required him to lift 90. What accounts for the striking difference between the percentage at Metro-North and the percentage at Long Island Railroad? The fact that the Long Island Railroad employees under their sweetheart contract at 50 years of age were able to retire at half salary and the federal government says if you apply and you qualify for a disability, you can get another $25,000 so that retirement made economic sense. For the Metro-North workers, they had to be 65 years of age before they were entitled to their Metro-North pensions. So that, in fact, that caused the Attorney General to conduct an order. Mr. Murray testified we had to replenish the Long Island Railroad pension fund by $20 million because everybody was pulling out of the Long Island Railroad. It was a sweetheart contract. That's why. Why don't you address the concern I raised with Mr. Durkin, which is not whether this might conceivably cause a jury to recalibrate certain evidence, but whether or not this is evidence that suggests that an innocent person has been convicted, which is not apparent to me. Help me out. All right. The government told the jury that Mr. Retigliano playing golf, as shown in this video, intends to defraud the RRB. He shouldn't be, he should be in a wheelchair. I'm sorry, he should be, but this is the way it was at the trial. Nevertheless. It was far more forceful than this, that he should be in a wheelchair. He shouldn't be playing golf. The standard didn't prevent him from playing golf. When you talk about the standard, the instruction that was given was that which comes from 20 CFR section 220.10. The one you're referring to is in the labor management governing principles. I'm not sure that that's the controlling legal principle. Let me tell you how. The regulation is the controlling principle. Let me tell you the process that produced that resolution and that standard. That's not my question. I'm not interested in the history of it. You're suggesting that there was an erroneous charge given. First of all, that was rejected in the first appeal. And I'm not sure how this change in evidence requires us to reconsider the standard. Because the jury was not told that Mr. Retigliano, if he had an impairment, that prevented him from doing one or more tasks. That's the standard the jury has to apply to determine whether or not they're eligible. That's a governing principle. It's not what the 20 CFR section 220.10 says. Because the principle that you're talking about was the product of what Congress demanded. In 45231A, Congress directed the RRB to establish a standard in consulting with the employer and the employee representatives. As a result of that process, you had the resolution. Right. And you were allowed to urge that interpretation of the RRB's disability standard in summation. I argued that in summation. It didn't mean anything because the judge didn't say that's the standard you have to apply. You're not here to re-examine the correctness of the jury charge. That was already decided on. But the newly discovered evidence showed that this court was in error. Because the newly discovered evidence reaffirms, including the Inspector General, that the standard that should be applied by the RRB to determine eligibility is whether or not you're enabled to perform a single task. You were able to put on whatever evidence, whether from experts or to the court, in arguing for the charge you wanted. That hasn't changed. I argued. I was denied the charge. I didn't have to produce anything else. So I was denied the charge wrongfully in all of the post-development evidence. And Judge Carney, Government Exhibit 100 has all the medical data of Dr. Lewinsky of 37 months of treatment. Injections, everything else, to show that he was disabled within the meaning of the standard that should have been applied that wasn't given to the jury. Government Exhibit 100 was the whole case. Thank you very much. Mr. Durkin, you reserve some time, too. Respectfully, I think the reason a wrongful conviction took place here or why an innocent man may have been convicted was implicit in the government's admission to you, which was astounding to me, that perhaps the fraud is continuing now, even then. Which seems to me would make any doctor who has now submitted claims under this reevaluation to be fair game as well. That's the problem with this case, and that's the problem, and that's why someone was wrongfully convicted. He did not, there is not sufficient evidence in this case for that conspiracy based on this newly discovered evidence. This evidence shows you what's wrong with the case. They have to concede that, yes, maybe fraud's still going on. They don't get around, and I don't know how anybody gets, I never understood this statistical evidence because the whole idea that the Metro-North can't, they can't retire until 65 makes the statistic meaningless to begin with. We tried to argue that before, and I don't want to re-argue that. But for your concern about somebody being wrongfully convicted, all you need to think about is what they just said. I'm a little confused. Certainly a doctor or your client, if he had simply said, I thought he couldn't perform a single task, and that was the basis for my opinion, could have argued that to the jury even now. The problem for your client was that he fabricated records. Am I missing something? I'm not sure where that evidence is. A doctor who did that today would be guilty. But I don't know. Who fabricated the records that supported his opinion. But I don't, I think you can look at this record, and maybe I'm mistaken, but you'll have a hard time finding fabricated evidence. He listed things that were wrong with these people. All four of those witnesses said, I had a shoulder problem. I had a knee problem. I told Dr. Lesniewski I had these problems. Pain is pretty subjective. And that all came out in cross-examination. Every one of these, not one of these people said that this was a wink and nod, and he knew what. Didn't one say to him, I need something more wrong with me? No. I still don't feel good. I need something more to be wrong. I don't think those are the words he used. I think he said he would like to have some more documentation. He asked for, I think, four or five different tests, and I think Dr. Lesniewski only performed two of them. So that cuts against that argument as well. Thank you, Mr. Kirby. Thank you. We're going to take this part of the case under advisement.